UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIZABETH VAN PELT,

                         Plaintiff,

- against -

MTV NETWORKS, VIACOM INTERNATIONAL INC., BETH MATTHEWS, in her official and individual capacity, VIRGINIA LAZALDE MCPHERSON, in her official and individual capacity, SANDY ASHENDORF, in her official and individual capacity, RUTH CHENG, in her official and individual capacity, DONALD SILVEY, in his official and individual capacity, GEORGE CHEEKS, in his official and individual capacity.

                         Defendants.

Docket No. 05 CV 10735 (SHS) (AJP)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

---

Defendants Viacom International Inc., Beth Matthews, Virginia Lazalde McPherson, Sandy Ashendorf, Ruth Cheng, Donald Silvey and George Cheeks (collectively "Defendants") submit this statement pursuant to Local Civil Rule 56.1(a) in support of their Motion for Summary Judgment and state that the following facts are not in dispute:

       1.      Plaintiff was first employed by MTVN in the summer of 1993 as a temporary secretary in MTVN's contract administration department. (Pl. Dep. 42, 43; Coyne Aff. ¶11, Exh. 10.)[1]

       2.      Following her resignation from MTVN and brief employment with Oxygen network, Plaintiff was rehired by MTVN in July 2000 as Manager, Contract Management in MTVN's Business and Legal Affairs ("BALA") Department. (Pl. Dep. 43,

---

[1] References to the deposition transcripts are cited herein as "[Last name] Dep. [page]." All cited excerpts and exhibits are attached to the Affirmation of Michele A. Coyne, filed herewith. The Complaint and Defendants' Second Amended Answer are also attached to the Coyne Affirmation.

46, 52.)

3.      Plaintiff fully acknowledges that her employment with MTVN is at-will and that she has never had an employment contract with MTVN. (Pl. Dep. 54.)

4.      Indeed, Plaintiff signed an employment application which expressly stated: ". . . my employment and compensation can be terminated with or without cause and with or without notice at any time . . ." (Pl. Dep. 51-54; Coyne Aff. ¶12, Exh. 11.)

5.      Although she has held several positions at MTVN, her duties throughout her employment have centered on negotiating and drafting production contracts for various MTVN channels and dealing with ancillary production matters. (Pl. Dep. 64.)

6.      Plaintiff's technical proficiency in handling contract and production work has always been considered above-average. (Pl. Dep. 37, 38; Matthews Dep. 37.)

7.      The areas in which her performance has been considered less strong are those involving co-worker and client interactions and working under stressful conditions, particularly when required to perform complex projects with minimal supervision. Additionally, Plaintiff has sometimes exhibited a negative attitude toward her work. (Matthews Dep. 37; McPherson Dep. 24, 25.)

8.      When Plaintiff returned to MTVN in 2000, she reported to Sean Johnson. (Pl. Dep. 45.)

9.      Plaintiff describes Johnson as "supportive," and she admits her relationship with him both before and after her maternity leave was "great." (Pl. Dep. 180, 181.)

10.     In early 2004, Johnson left the company, and Plaintiff began reporting to Jeff Schneider. (Pl. Dep. 48.)

11.     Plaintiff describes working for Jeff Schneider as positive throughout and even states that she "wouldn't mind reporting to him again." (Pl. Dep. 82.)

12.     In approximately March 2004, Koethi Zan was hired by MTVN, and Plaintiff began reporting both to Schneider and Zan. (Pl. Dep. 48-50.)

13.     Since returning from a second maternity leave in March 2005 and to the present, Plaintiff has reported only to Zan. (Pl. Dep. 49.)

14.     Plaintiff admits that she and Zan (who is herself now on maternity leave) have a "great relationship" and "work really well together." (Pl. Dep. 40-41.)

15.     Plaintiff describes Zan as "really dynamic" and "a fabulous manager." (Pl. Dep. 41.)

**Plaintiff's Pregnancy and First Maternity Leave**

16. In January 2003, Plaintiff informed her managers that she was pregnant. (Pl. Dep. 106.)

17. The response of MTVN employees was overwhelmingly positive and supportive. For example, when Beth Matthews, Senior Vice President and Deputy General Counsel and an individual defendant in this action, learned Plaintiff was pregnant, she sent her a congratulatory email, with what Plaintiff describes as a "friendly" and "positive" tone. (Pl. Dep. 105, 107.)

18. Donald Silvey, another individual defendant, also sent Plaintiff a congratulatory email about her pregnancy, and Sean Johnson congratulated her in person. (Pl. Dep. 108.)

19. Matthews and George Cheeks, Executive Vice President of Business Affairs and General Counsel and yet another individual defendant, threw Plaintiff a surprise baby shower, which they both attended. (Pl. Dep. 220-222.)

20. Matthews went to considerable effort to make arrangements for the shower, including the decorations, food and a personal gift. (Pl. Dep. 221, 226.)

21. Plaintiff admits that MTVN fully accommodated the job restrictions imposed by her doctor during her pregnancy. (Pl. Dep. 67-68.)

22. Indeed, her work was distributed to others in the department in order to accommodate her maternity leave. (Pl. Dep. 217.)

23. Plaintiff took her first maternity leave from June to October 2003. (Pl. Dep. 18, 19.)

24. She was not alone in taking advantage of the Company's maternity leave benefit; from June 2002 to June 2003, 83 of MTVN's employees requested and were granted maternity leave. (Pl. Dep. 244-45.)

**The BALA Compensation Review**

25. In or about May 2003, in order to ensure that decisions within the department regarding compensation and titles were made on the basis of consistent criteria across networks, and to ensure that BALA compensation practices were competitive with those of comparable organizations, BALA hired an outside consultant to conduct a study of compensation and career pathing. (Cheeks Dep. 16-17, 53; Matthews Dep. 59-60.)

26. A number of employees, including Plaintiff, were identified during the months-long study as individuals who may be due for a promotion and salary increase; however, promotions were generally put on hold until the study was completed. (Cheeks Dep. 46; Matthews Dep. 65.)

27. Plaintiff was aware of the BALA compensation review. (Pl. Dep. 121, 122.)

**Acquisition Of CTN And The CTN Contract Management Position**

28. In or about October 2002, MTVN acquired College Television Network ("CTN"), which delivers programming to televisions located in common areas of college campuses, such as cafeterias and lounges. (Cheeks Dep. 33.)

29. The success of CTN was and is dependent upon the extent of its distribution to colleges and universities – known as "affiliates." At the time MTVN acquired CTN, CTN had upwards of 750 contracts with colleges and universities. These contracts required a large amount of administration since MTVN did not hire CTN's existing employees as part of the deal. (Ashendorf Dep. 55-56; Kamali Dep. 32.)

30. Beginning in or about December 2002, MTVN sought applications for the new position of Contract Manager for CTN. The position requiring experience and aptitude in a variety of business areas, including affiliate sales and production. (Matthews Dep. 9; McPherson Dep. 14.)

31. Although the position was characterized as a "Contract Manager," MTVN contemplated that the person selected for that position might well be given a Director title, depending on that individual's experience. (Cheeks Dep. 34-35; Matthews Dep. 18; Cheng Dep. 40-41, 46; Pl. Dep. 204, 205.)

**Plaintiff's Application For The CTN Position**

32. In or about January 2003, at around the same time that Plaintiff announced her pregnancy, she saw a job posting for the Contract Manager position with CTN. (Pl. Dep. 93, 94.)

33. Some time later, Plaintiff expressed interest in the CTN position to Matthews. Matthews, knowing Plaintiff was pregnant, encouraged her to apply. (Matthews Dep. 40-41; Pl. Dep. 103-104.)

34. Plaintiff was one of twenty applicants for the CTN position, approximately half of whom were female. (Pl. Dep. 110, 244.)

35. Candidates were screened initially by a recruiter from Human Resources, Ruth Cheng. (Cheng Dep. 18; Ashendorf Dep. 22-26.)

36. Plaintiff was ultimately selected as one of three candidates that Matthews advanced to the final round of consideration. (Pl. Dep. 114, 159-160; Matthews Dep. 36.) All three finalists were women. (*Id.*)

37. Plaintiff met with at least five MTVN executives in connection with applying for the position. (Pl. Dep. 118, 119, 133-134, 143, 145.)

38. The interviewers asked Plaintiff such questions as why she was

interested in the CTN position and told her about the responsibilities of the new position. (Pl. Dep. 97, 98, 119, 130, 135, 146, 147.)

**The Decision To Hire Bahareh Kamali As Director, Contract Management For CTN**

39.     Ultimately, Matthews decided who to hire for the CTN position. (Matthews Dep. 46-47; Cheeks Dep. 25.)

40.     Matthews asked approximately nine senior professionals within BALA for input into the decision, including by asking them to independently rank the finalists and to provide feedback. (Matthews Dep. 43; Cheeks Dep. 25.)

41.     Notably, one of the individual defendants, Donald Silvey, cancelled his interviews and did not provide feedback or otherwise participate in the decision-making process. (Matthews Dep. 43, 44; Pl. Dep. 153.)

42.     Ruth Cheng screened candidates and passed along qualified candidates to Matthews. (Cheng Dep. 18, 21-22; Ashendorf Dep. 22-26.)

43.     Bahareh Kamali was the clear favorite, primarily because of her diversified experience in the industry. (Matthews Dep. 47, 48; McPherson Dep. 22, 23, 30; Ashendorf Dep. 40-43, 48, 49; Coyne Aff. ¶ 13, Exh. 12.)

44.     Specifically, Kamali had worked at a number of different entertainment entities including broadcast television, public television, news and cable outlets as well as entertainment unions. (Kamali Dep. 14, 22; Matthews Dep. 48; Coyne Aff. ¶ 13, Exh. 12.)

45.     Kamali also had approximately eight years of experience working on a wide variety of deals including overall production deals, distribution deals, development deals, licensing deals, talent deals, services agreements, consulting agreements, and multimedia agreements. (Kamali Dep. 8-9, 13-14, 25, 29-30; Matthews Dep. at 48, 49-50; Coyne Aff. ¶ 13, Exh. 12.)

46.     In addition, Kamali had twice before worked at the ground level of start-up entertainment companies, much like the newly-launched CTN. (Kamali Dep. 31.)

47.     Moreover, Kamali was perceived by the interviewers as knowledgeable, personable and diligent, a potent combination which was expected to enhance MTVN's ability to "sell" CTN to affiliates and maintain solid relationships with the affiliates post-sale. (Matthews Dep. 48-50; Cheeks Dep. 29, 48-49; McPherson Dep. 22, 23; Ashendorf Dep. 45, 47.)

48.     Plaintiff was just not considered as qualified as Kamali. (Matthews 47, 48; McPherson Dep. 22, 23, 30; Ashendorf Dep. 38-40, 42, 43, 48, 49.)

49. Plaintiff's experience was primarily limited to production, and in comparison to Kamali she lacked experience in distribution and other business development transactional work. (Matthews Dep. at 39, 48.)

50. In addition, concerns were expressed about Plaintiff's attitude, her sometimes impersonal relationships with internal clients, and her ability to work independently under stressful conditions. (Matthews Dep. 37; McPherson Dep. 25.)

51. Since CTN was to be very thinly staffed, the successful candidate would be required to service approximately 750 affiliates with little administrative support. Finally, and importantly, Plaintiff left the impression during several interviews that she was more interested in leaving her current position and/or attaining a promotion to Director than she was in actually assuming the job responsibilities associated with the CTN position. (Ashendorf Dep. 48, 51.)

52. Ultimately, Matthews decided to accept the recommendation of the group, and she selected Kamali to fill the CTN position. Kamali assumed the title Director, Contract Management. (Kamali Dep. 26.)

53. The decision to give Kamali a Director title was based on the available budget and Kamali's experience, and was not definitively made until Kamali was selected and hired. (Pl. Dep. 132, 140-141, 204-205; Matthews Dep. 48, 65; Cheeks Dep. 35.)

54. In April 2003, Cheeks informed Plaintiff that someone else had been selected for the CTN position, but that he was going to recommend that she be promoted to Director after the compensation reviews. (Pl. Dep. 160-161; Cheeks Dep. 47-48, 57.)

55. Cheeks explained that there was a freeze on promotions pending the results of the department-wide compensation review. (Pl. Dep. 167.)

56. By her own description, Plaintiff was not upset about the fact that she was not selected for the CTN position. (Pl. Dep. 175.)

57. In fact, she was optimistic about the possibility of becoming Director in her current position. (*Id.*)

58. That all changed when, on May 13, 2003, Plaintiff learned that Kamali had been given the title of Director. (Pl. Dep. 169, 174.)

59. Plaintiff admits that she does not know anything about Kamali's skills, education, or previous job responsibilities. (Pl. Dep. 171, 172.)

60. And notably, Plaintiff never told any of her supervisors or anyone in Human Resources at the time of the decision that she felt she did not get the CTN position because of pregnancy discrimination. (Pl. Dep. 211-216.)

**Plaintiff's Promotion to Director**

61.     Upon completion of the BALA compensation and career pathing study several months later, a number of employees, including Plaintiff, received salary and/or title adjustments. (Pl. Dep. 62, 63; Cheeks Dep. 54, 55.)

62.     In January 2004, Plaintiff was promoted to Director (*i.e.*, the same title as Kamali), retroactive to July 1, 2003, and she received a corresponding (and retroactive) salary increase. (Pl. Dep. 62, 63, 83; Coyne Aff. ¶ 14, Exh. 13.)

63.     This promotion (like several others) had been in the pipeline for several months and Plaintiff knew that Cheeks was in favor of such a promotion for her. (Cheeks Dep. 46.)

**Plaintiff's Positive Employment Experience Since Lodging Her Complaint**

64.     Plaintiff admits that she has never been demoted, nor has she ever experienced a reduction in her annual salary or her bonus percentage. (Pl. Dep. 59- 61.)

65.     Indeed, her salary has increased nearly $30,000 (or *more than 43%*) in the three years since she raised a complaint about the CTN position. (Pl. Dep. 57-59.)

66.     Specifically, at the time of the decision to promote Plaintiff in 2003, her base salary was $58,024. (*Id.*; Coyne Aff. ¶ 14, Exh. 13)

67.     Today, her base salary is more than $83,000 and her total compensation in 2005 was more than $101,000. (Pl. Dep. 59; Coyne Aff. ¶ 15; Exh.14.)

68.     Plaintiff received above standard merit increases and above target bonuses in 2005 and 2006. (Pl. Dep. 85-89.)

69.     And the plain fact is that, both Plaintiff and Kamali hold the title "Director" and Plaintiff now makes *more* than Kamali. (Pl. Dep. 59; Kamali Dep. 4, 18.)

70.     Further, Plaintiff has also received "exceeds expectations" performance reviews every year since she raised her complaint. (Pl. Dep. 37; Cheeks Dep. 57.)

71.     Plaintiff took a second maternity leave without incident from December 2004 to March 2005. (Pl. Dep. 21.)

72.     Since raising her complaint, Plaintiff has asked for and received additional areas of responsibility. (Pl. Dep. 65, 219; Cheeks Dep. 58-59.)

73.     In addition, although the Complaint alleges that she has not been afforded the opportunity to work on higher profile projects, Plaintiff admits that any lack of opportunity has been dictated by "business needs." (Pl. Dep. 249, 250.)

74. Moreover, although Plaintiff would prefer to have an office with a window, she acknowledges that (i) she had been on a wait list for a window office long *before* she lodged her Complaint and (ii) Zan has tried to get her a window office and has not been successful merely "because there is no space." (Pl. Dep. 175, 241.)

75. As Plaintiff admits, whether she was in her current position or in the CTN position, she would be going out on maternity leave, and in either case her work would have to be distributed to others (as it was during both of her maternity leaves). (Pl. Dep. 184, 185.) Thus, BALA would be forced to shoulder the same burden irrespective of whether Plaintiff was selected for the CTN position. -- *i.e.*, her work would have to be handled by others. (*Id.*)

76. Plaintiff now concedes, that the statements and questions allegedly posed to her during her interviews are routine in a job interview, that they are job-related, and that she has herself asked these types of questions when interviewing applicants. (Pl. Dep. 74-76.)

77. Indeed, these are the same types of job-related questions that were directed to Kamali by the interviewers. (*See* Kamali Dep. 25-26.)

78. At her deposition, Plaintiff did not recall any statement by Johnson concerning why she did not get the CTN position. (Pl. Dep. 178-182.)

79. Plaintiff describes her interaction with Matthews during the same conversation in which Matthews allegedly asked Plaintiff her due date and asked her whether she was returning to work after her maternity leave as "friendly" and "sweet." (Pl. Dep. 98.)

80. After extensive interviews and after seeking input from a group of nine professionals, Matthews believed Kamali was a more qualified applicant, primarily because of her diversified experience in the industry. (Matthews Dep. 43-46, 48.) Indeed, nearly all of the nine senior professionals who were asked to rank the three finalists agreed that Kamali was the most qualified candidate, and when Matthews tallied the rankings of the nine individuals, Kamali was the clear winner. (*Id.*)

81. Plaintiff does not even allege that she was objectively *more* qualified than Kamali. (Pl. Dep. 148, 171-172.)

82. Although another candidate was deemed better qualified to support CTN, Plaintiff was promoted to the same title and higher pay only months later. (Pl. Dep. 62-63, 83; Coyne Aff. ¶ 14, Exh. 13.)

83. While Plaintiff may believe that an internal candidate would have been a better choice for the CTN position, she cannot dispute the uncontradicted, sworn testimony of MTVN executives that both external and internal candidates were considered, and that being an internal candidate was not a requirement for the CTN position. (Pl. Dep. 126, 138-140, 148; Cheng Dep. 20, 43-44; Coyne Aff. ¶ 16, Exh. 15.)

84. As Plaintiff concedes, although half of the applicants were male, the three finalists were all female, and the person ultimately selected for the position was female (Pl. Dep. 159, 171.)

85. Plaintiff now admits that even she does not believe her gender was a motivating factor. (Pl. Dep. 125, 127, 140, 151.)

86. Plaintiff has been promoted to the Director title that she coveted and which is at the heart of this litigation, she has received above average salary increases for a total increase in her base salary of 43% in three years, she has received above-target bonus payments, and she has received overwhelmingly positive performance reviews. And she has been granted a second maternity leave without incident. (Pl. Dep. 21, 37, 57-59, 85-89, Coyne Aff. ¶ 14, 15, Exh.13, 14.)

87. Plaintiff admits that she has had "great" relationships with all of her direct supervisors since the time of her complaint and, in fact, has no basis to believe that her direct supervisors were even aware of her allegations. (Pl. Dep. 40, 41, 82, 180, 181.)

88. It is undisputed that, even if the supposed "offer" to promote Plaintiff to Director was made, it was fulfilled: Plaintiff was in fact promoted to the position of Director in her then current position. (Pl. Dep. 124.)

89. Plaintiff admits that she never had an employment contract and that she understands her employment to be at will. (Pl. Dep. 54.)

Dated: New York, New York
      June 30, 2006

                                KAUFF McCLAIN & McGUIRE LLP

                                By: /s/ Michele A. Coyne
                                Michele A. Coyne (MC-1795)

                                950 Third Avenue, Fourteenth Floor
                                New York, New York  10022
                                (212) 644-1010

                                Counsel for Defendants